IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No.1:01cr405-LO |
| ) | |
| BRIAN P. REGAN, ) | |
| ) | |
| Defendant ) | |

### United States' Response in Opposition to Defendant's Motion for Compassionate Release

In light of the novel coronavirus and the COVID-19 pandemic, defendant seeks early termination of his prison term under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i). In 2003, the defendant was convicted of Attempted Espionage and Gathering National Defense Information and was sentenced to life without parole. He is now incarcerated at FCI Hazelton, a facility of 1141 inmates, with no current positive cases of COVID-19. The Court should deny defendant's motion. Using compassionate release in this case would fail to address a range of important practical and legal problems and would not satisfy the standards in § 3582(c)(1)(A).

### Background

Between 1999 and August 2001, Brian P. Regan was an Air Force intelligence analyst assigned to the National Reconnaissance Office. During that time, the defendant collected Top Secret national defense information, which he passed and attempted to pass to the foreign intelligence services of Iraq, Libya, and China, in exchange for a payment of $13 million dollars. PSR at 3. On July 24, 2002, the defendant was charged in a superseding indictment with three counts of Attempted Espionage, in violation of Title 18, United States Code, Section 794(a), and Gathering National Defense Information, in violation of Title 18, United States Code, Section

793(b). After trial by jury, defendant was convicted of two counts of Attempted Espionage and Gathering National Defense Information. On March 20, 2003, the defendant and the United States entered into a written sentencing agreement. Pursuant to that agreement, the parties agreed to a sentence of life imprisonment without parole, and the defendant agreed to waive his right to appeal his conviction. PSR at 3.

In his motion for compassionate release, the defendant represents that on July 15, 2020, he filed a request for compassionate release with the warden of FCI Hazelton. DKT 367 at 98. His request to the warden is not included in his motion to the court.

On August 3, 2020, Warden Adams denied the defendant's request, finding the defendant's concerns over contracting the virus did not warrant early release. DKT 367 at 112.

On August 31, 2020, the defendant filed this motion for compassionate release. DKT 367.

## Argument

**I.   The Court should weigh a number of practical considerations in evaluating defendant's request for compassionate release.**

The Federal Bureau of Prisons ("BOP") is actively working to contain the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[1] This last step carries special importance for defendant's request for compassionate release.

---

[1] *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

Before the CARES Act was passed, § 3624(c)(2) provided BOP with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." This provision is in keeping with BOP's authority to designate where an inmate serves a sentence. Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) of the Act suspends, during the coronavirus emergency, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[2] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, BOP has placed over 7600 inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of particular inmates, the prisons most at risk, and the dangers posed by inmates if released. Inmates do not have to apply to be considered for home confinement.

In weighing the appropriateness of home confinement, BOP considers, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the

---

[2] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, BOP is requiring a 14-day quarantine period before any inmate is released to home confinement.

In addition to these efforts to increase the use of home confinement, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Current modified operations plan require that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly admitted inmate is screened for COVID-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred

from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and presently remain suspended to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts. And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court

order.

In any event, the Court's adjudication of the defendant's motion necessarily touches on many of the following fact-specific issues:

- *Safety of place of home detention.* An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism.* The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[3] Defendant Bass had a Criminal History Category of VI, reflecting 13 or more criminal history points. PSR at 14. New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection.* Any release should include measures to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.* Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

This list is not exhaustive and, indeed, could include many additional considerations. The key point is that, in light of the BOP's efforts to control the spread of COVID-19, the Court

---

[3] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

should exercise its discretion in such a way as to grant compassionate release only where the defendant's medical situation, the presence of coronavirus at his facility of confinement, and the statutory sentencing factors support doing so.  For the reasons that follow, this is not such a case.

## II.     The defendant has not established a sufficient basis for compassionate release.

The defendant bears the burden to demonstrate that he is entitled to compassionate release under § 3582(c)(1)(A)(i).  *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see also generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise … the burden of persuasion lies … upon the party seeking relief.").  Compassionate release is not appropriate on these facts because the defendant has not established "extraordinary and compelling reasons" for such relief under § 3582(C)(1)(A)(i).

Courts have generally agreed the existence of the pandemic, standing alone, is not a sufficient basis for granting compassionate release.  As the Third Circuit put it, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  Instead, courts in this district have found "extraordinary and compelling reasons for compassionate release [on the basis of COVID-19] when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, — F. Supp. 3d —, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).[4]

---

[4] *See also United States v. Little*, No. 1:10-CR-135 (CMH), 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020) (adopting the criteria from *Feiling*); *United States v. White*, No. 3:18-CR-61

7

Because the defendant has not satisfied these criteria, the Court should deny his motion.

### A.  The defendant has not demonstrated that he faces higher susceptibility to COVID-19.

The defendant has failed to meet his burden of showing that "extraordinary and compelling reasons" exist to warrant early compassionate release pursuant to § 3582(c)(1)(A)(i). The defendant is 57 years old, a white male, and says he suffers from hypertension, diabetes, hyperlipidemia, obesity, and chronic pain. DKT 367 at 103. Defendant has submitted no medical records at this time.

Although hypertension and diabetes are risk factors for COVID-19, medical personnel at FCI Hazelton have prescribed medications for the defendant (Metformin twice daily for his diabetes and Lisinopril once daily for hypertension) which appear to be appropriate treatments. He is also receiving additional medications for his remaining ailments.

"BOP's guidance, read in conjunction with the Application Notes to § 1B1.13, indicate that a defendant's medical condition must be one of substantial severity and irremediability . . . ." *United States v. Lisi*, No. 15-CR-457, 2020 WL 881994, at *4 (S.D.N.Y. Feb. 24, 2020), *reconsideration denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020).

> Section 1B1.13 provides that a defendant can establish an extraordinary and compelling reason if he is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover."

*Lisi*, 2020 WL 881994, at *4 (quoting U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)). "Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." *United*

---

(HEH), 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) ("Defendant's request for release on home confinement is based upon nothing more than 'the mere possibility that COVID-19 will spread to his facility'-a fear that is insufficient to justify release."(citing *Feiling*)).

8

*States v. Ayon-Nunez*, No. 1:16-CR-130, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (internal quotation marks omitted) (denying motion for release where "defendant merely claims in conclusory fashion that he suffers from a number of medical conditions, including severe back injuries and epilepsy, that are not being adequately treated at his institution of confinement"). The defendant here has also not shown that his asserted medical conditions are "of substantial severity and irremediability" as required. *Lisi*, 2020 WL 881994, at *4 (denying motion for compassionate release where defendant "provided documentation indicating that he is suffering from issues relating to a maxillary cyst, which is affecting his vision and sense of smell; chronic asthma; pain in his back, shoulders, and left arm; and chronic high blood pressure").

In view of defendant's apparently well managed conditions, and the defendant's apparent ability to care for himself, his medical conditions do not constitute an "extraordinary and compelling reason" justifying compassionate release under 18 U.S.C. § 3582(c)(1)(A).

### B. The defendant has not shown that his prison facility is at heightened risk of a coronavirus outbreak.

With respect to an individualized showing regarding defendant's prison facility, his claim is equally unpersuasive. He is incarcerated at FCI Hazelton, which has an inmate population of 1141. According to the latest statistics available from the BOP, FCI Hazelton has had 0 inmates test positive for COVID-19 out of 157 tested. Two staff members are positive and five have recovered. Although the defendant states he is afraid he will catch COVID-19, his fears are not validated by the very low prevalence of the virus at FCI Hazelton. In denying his request, Warden Adams determined that defendant's concern about contracting COVID-19 did not currently warrant an early release from his sentence. DKT 367at 112.

All inmates who have tested positive within the BOP are being appropriately treated or isolated according to CDC guidelines adopted by the BOP. The facility continues to adhere to

the BOP modified operations plan described above in the government's responsive pleading, and has, among other steps, restricted prisoner movements within the facility, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, and provided masks and hand cleaners. For all of these reasons, the defendant has not shown, in any particularized fashion, that he is entitled to additional relief based on the risk of contracting COVID-19. *Cf. United States v. Campos-Ramenthol*, 805 F. App'x 328, 330 (5th Cir. 2020) (defendant not entitled to pretrial release due to COVID-19 where "[t]here were no reported cases of COVID-19 at the jail" where he was housed and "the jail has procedures in place in case of an outbreak, including the isolation of high-risk inmates").

### C. The defendant has not shown he has a viable release plan.

Although the defendant proposes to live with his wife at her home in Chesapeake Beach, Virginia, his release will increase the risk of exposure for defendant, his family, and anyone with whom they come into contact, including court employees, like probation officers, who will be required immediately to interact with and supervise defendant under demanding conditions, likely for an extended period of time. Further, it is not clear that defendant's immediate release would afford him unrestricted access to his private healthcare providers, unlike the access he has to healthcare providers at FCI Hazelton, who appear to be successfully managing the defendant's conditions.

Presently, medical staff at FCI Hazelton are visiting, assessing, and treating inmates on a daily basis, while wearing protective equipment and taking appropriate precautions. Considering the limitations placed upon in-person visits by some medical offices, it is likely the defendant will have greater, unfettered access to medical care at FCI Hazelton than in the community. *See, United States v. Feiling*, — F. Supp. 3d —, 2020 WL 1821457, at *8 (E.D. Va. Apr. 10, 2020)

("Defendant's release on home confinement presents its own risks to Defendant's health, the health of his family and public safety."); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *6 (E.D. Va. June 23, 2020) ("[I]t is not clear to this Court that Defendant would be safer from the virus on home confinement."); *United States v. Chappell*, No. 16-CR-512 (LTS), 2020 WL 3415229, at *3 (S.D.N.Y. June 22, 2020) ("The record also demonstrates that Mr. Chappell is regularly receiving appropriate medical care at his facility, and Mr. Chappell has provided no indication that he will have ready access to the requisite medical care for his serious health concerns if his request for immediate home confinement or transfer to a halfway house is granted."); *Brown v. United States*, No. 4:18-CR-96 (RAJ), 2020 WL 3129573, at *2 (E.D. Va. June 12, 2020) (denying compassionate release where defendant's weight and blood pressure improved while in BOP custody); *United States v. Rodriguez*, — F. Supp. 3d —, 2020 WL 1866040, at *4 (S.D.N.Y. Apr. 14, 2020) ("Rodriguez has also not explained how he would be safer outside of prison, where authorities could not enforce isolation and quarantines ….").

    **D.**    **In the exercise of its discretion, the Court should deny compassionate release in light of the statutory sentencing factors.**

Compassionate release is only appropriate where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). That statute instructs the court to consider several factors, including whether the underlying offenses constitute crimes of violence, whether the offenses involved firearms, and the defendant's criminal record. At the same time, § 3582(c)(1)(A) expressly directs the Court to consider the statutory sentencing factors under 18 U.S.C. § 3553(a) in adjudicating a compassionate-release motion. Here, these factors counsel against granting a reduction in the defendant's sentence.

The defendant was convicted of Attempted Espionage and Gathering National Defense

11

Information. Espionage is a crime against the United States of America and its citizens. The defendant took an oath of loyalty to the United States, and was entrusted with many of our nation's most highly classified intelligence secrets. But he exploited that access, betrayed his oath, and for 13 million dollars was willing to compromise United States defense systems worth billions of dollars.

The government credits the defendant his placement in the honor dormitory. But defendant's evidence of rehabilitation does not amount to an extraordinary and compelling circumstance justifying compassionate release. Congress has expressly directed that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" to grant compassionate release, 28 U.S.C. § 994(t).

Finally, if this Court were to disagree with the United States' position, any release order should require defendant to undergo a 14-day quarantine controlled by BOP.

## Conclusion

For the foregoing reasons, the Court should deny the defendant's motion for compassionate release.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s/_____
Patricia Haynes (#49038)
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office: (703) 299-3724
Fax: (703) 299-3980
Email: patricia.haynes@usdoj.gov

**Certificate of Service**

I certify that on September 14, 2020, I filed the foregoing with the Clerk of Court using the ECF system which sent a notification to all parties and have mailed a copy to the defendant:

Brian P. Regan
#41051-083
FCI Hazelton
P.O. Box 5000
Bruceton Mills, WV 26525

By: _____/s/_____
Patricia Haynes
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:  (703) 299-3700
Fax:  (703) 299-3980
Email:  patricia.haynes@usdoj.gov